UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
MILLENIUM EXPRESSIONS, INC.,          :  02 Civ. 7545 (JCF)
                                      :
                  Plaintiff,          :         OPINION
                                      :        AND ORDER
        - against -                   :
                                      :
CHAUSS MARKETING, LTD., PRIME         :
SOURCE ACCESSORIES, LTD., JAMIE       :
CHAUSS and NATHAN ROSENBAUM,          :
                                      :
                  Defendants.         :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

        This case illustrates the perils of acting rashly.  Jamie

Chauss, as principal of Chauss Marketing, Ltd. ("Chauss

Marketing"), entered into a contract to act as sales representative

for Millenium Expressions, Inc. ("Millenium"), an importer of gifts

and accessories.  When Millenium did not take Mr. Chauss' advice to

lower its prices on certain items, Mr. Chauss reacted precipitously

by offering customers competing products, in violation of the

contract with Millenium.  When Peter Lin, the principal of

Millenium, learned of this, he withheld commissions that Mr. Chauss

had earned, thus violating Mr. Chauss' statutory right to prompt

payment.  Then, when Millenium sued for breach of contract, Mr.

Chauss reacted by submitting an affidavit in which he falsely

attested that the contract at issue had been superseded by a new

agreement between the parties, a response that results in his

forfeiting statutory relief to which he might otherwise be

entitled.

The parties consented to try this case before me pursuant to 28 U.S.C. § 636(c).  They waived a jury, and a bench trial was conducted on September 11 and 12, 2006.  This opinion constitutes my findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

Background

In October 1991, Jamie Chauss formed Chauss Marketing, a Minnesota Corporation that acted as an independent sales representative organization and maintained a principal place of business in Minnesota and a showroom in New York City.  (Tr. at 299, 301, 345-46).[1]  The company operated as "Prime Source Accessories, a division of Chauss Marketing" ("Prime Source").[2] (Pl. Exhs. 7, 9).[3]  In the fall of 1996, one of Prime Source's employees, Michael Miller, was approached at the showroom by Fang Chi Lin, who is known as Peter Lin.  (Tr. at 6-7).  Mr. Lin was president and owner of Millenium, a New York Corporation he had formed earlier that year to import and distribute accessories.

---

[1] "Tr." refers to the trial transcript.

[2] Because, as will be discussed below, Mr. Chauss used the trade name "Prime Source" in dealing with Millenium regardless of the corporate form he was utilizing, I will refer both to Chauss Marketing and Prime Source Accessories as "Prime Source" insofar as they acted as sales agent for the plaintiff.

[3] Unless otherwise indicated, the referenced exhibits were introduced at trial.

(Tr. at 3-5).  Mr. Lin expressed interest in retaining Prime Source to act as its sales representative to accounts in the United States.  (Tr. at 6-8).

Thereafter, Mr. Lin had a series of telephone conversations directly with Mr. Chauss.  (Tr. at 8).  Mr. Chauss then sent Mr. Lin a proposed sales representative agreement.  (Tr. at 8-9).  That agreement, between Millenium and "Chauss Marketing, Ltd. a/k/a Prime Source Accessories," provided that Prime Source, identified as the "Representative," would be the exclusive representative of Millenium, the "Manufacturer," throughout the United States.  (Pl. Exh. 1, ¶ 1).  It further provided that "[t]his Agreement can be canceled on 90-days written notice by either party.  Representative can only be terminated for good cause."  (Pl. Exh. 1, ¶ 6).  After Mr. Lin reviewed the contract, he contacted Mr. Chauss and indicated that he wanted a clause that would restrict Prime Source from selling products that competed with Millenium's.  (Tr. at 9-10).  Mr. Chauss agreed, and Mr. Lin forwarded a new draft that was identical to the original except that it included a new paragraph stating, "It is agreed and understood that Representative will not carry another line of picture frames or accessories that will be conflicting to the Manufacturer's product line."  (Tr. at 10-11; Pl. Exh. 2, ¶ 6).  On October 10, 1996, the parties signed this agreement (the "Letter Agreement").

At the time the Letter Agreement was executed, Millenium's

product line consisted primarily of picture frames, together with some accessories such as hair brushes, while Prime Source was acting as a representative for companies selling costume jewelry. (Tr. at 8, 302-03). Millenium's business quickly expanded, both in volume and in the types of merchandise it offered. (Tr. at 182-84). While it continued to sell picture frames, Millenium began offering a wide range of merchandise including room decorations, stationery, combs, brushes, cosmetic cases, and manicure kits. (Pl. Exh. 11).

In January 1997, Mr. Chauss combined his sales representative business with that of Nathan Rosenbaum and formed a company called Prime Source Accessories, Ltd. (Tr. at 310-11). On March 30, 1997, Mr. Chauss sent a memorandum by facsimile to each vendor he represented advising them to make commission checks payable to Prime Source Accessories, Ltd. while continuing to pay showroom fees to Chauss Marketing. (Pl. Exh. 8). In fact, although Millenium paid its first showroom fee to Chauss Marketing in response to this request, its subsequent checks were made payable to "Prime Source" or "Prime Source Accessories, Ltd." (Tr. at 38; Pl. Exh. 14).

In November 2001, Prime Source "began independently importing selected girls' accessories, some of which overlap with products offered by Millenium." (Chauss Marketing, Ltd.'s and Prime Source Accessories, Ltd.'s Post-Trial Submission ("Def. Memo.") at 7).

4

According to Mr. Chauss, he embarked on this program because Mr. Lin refused to lower his prices on some items to competitive levels, making it necessary for Mr. Chauss to provide alternatives in order to offer a full line of products to customers.  (Tr. at 325-29).

Sometime in July 2002, Mr. Lin learned that Prime Source was selling competing products.  (Tr. at 64-65).  While visiting one of his customers, a Limited Too store, he discovered hairbrushes on display that were not Millenium products.  (Tr. at 65-69).  By matching the vendor number to records maintained by Limited Too, Mr. Lin determined that the items had originated with Prime Source.  (Tr. at 65-77).  Further investigation revealed that Prime Source had sold a wide range of products to Limited Too that were equivalent to items in Millenium's product line.  (Pl. Exh. 25).

Mr. Lin felt "betrayed" and "violated."  (Tr. at 191).  On August 9, 2002, by means of a letter from its attorney, Millenium terminated the Letter Agreement.  (Def. Exh. 9).  It declined to pay commissions on sales that Prime Source had already made and demanded the return of Millenium product samples that Prime Source had acquired for display in its showroom.  (Tr. at 239-41; Pl. Exhs. 29, 32, 34).

Millenium filed the instant action in this Court on October 19, 2002.  It asserted claims against Chauss Marketing and Prime Source Accessories, Ltd. for (1) misappropriation of trade secrets,

(2) unfair competition, (3) misappropriation of proprietary information, (4) tortious interference with a business relationship, (5) breach of contract, (6) unjust enrichment, (7) an accounting of profits, (8) fraud in the inducement, and (9) conversion.  The defendants sued Millenium in the United States District Court for the District of Minnesota but then discontinued that action and filed an answer in this case.  In that answer they asserted counterclaims for (1) violation of the Minnesota statute governing termination of sales representatives, Minn. Stat. § 325E.37, (2) breach of contract, (3) quantum meruit, (4) violation of the Minnesota law requiring prompt payment of commissions to commission salespeople, Minn. Stat. § 181.145, and (5) an accounting.[4]

At the close of discovery, the defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The Honorable Richard M. Berman, U.S.D.J., to whom the case was then assigned, granted the motion in part and denied it in part.  He dismissed altogether Millenium's claims for tortious interference with a business relationship and fraud in the inducement.  He denied summary judgment on the claims for unfair competition, breach of contract, unjust enrichment, and an accounting of profits.  With respect to the claims for

---

[4] Prime Source withdrew its claim for an accounting, and I will therefore not address it here.

misappropriation of trade secrets and proprietary information, Judge Berman granted summary judgment insofar as the plaintiff's allegations were based on its product designs but denied it to the extent that Millenium asserted that Prime Source had misappropriated marketing information.   Finally, Judge Berman dismissed so much of the conversion claim as related to the alleged copying of Millenium's samples, but allowed the claim for conversion of the physical samples to proceed.   (Order dated Aug. 11, 2004, at 21).

The case then proceeded to trial where evidence was introduced establishing the facts recited above.   Additional facts will be discussed in connection with the analysis of each claim.

<u>Discussion</u>

A. <u>Millenium's Claims</u>

1. <u>Breach of Contract</u>

a. <u>Liability</u>

Millenium contends that the defendants breached the Letter Agreement by promoting competing products.   On summary judgment, the defendants took the position that the Letter Agreement had been superseded by an oral agreement between Millenium and Prime Source Accessories, Ltd.   Mr. Chauss submitted an affidavit in which he stated:

> In January 1997, Chauss Marketing ceased activities as an independent sales representative organization, including its work on behalf of Millenium under the Chauss Marketing Letter Agreement.   At this same time, Millenium

> entered into a new, verbal agreement with Prime Source, whereby it retained Prime Source as its independent sales representative to sell its products to the same customers and class of trade previously serviced by Chauss Marketing. At all times the independent sales representative agreement between Millenium and Prime Source has been oral and for an indefinite duration. In no way did the oral agreement between Prime Source and Millenium limit, in any fashion, Prime Source's ability or right to sell, import, manufacture or market any type of product to, or on behalf of, any customer -- regardless of whether such products were competitive with those imported by Millenium.

(Pl. Exh. 6 (Affidavit of Jamie Chauss dated Oct. 10, 2003), ¶ 5). As became apparent at trial, these representations were false and misleading. The only "agreement" that Mr. Chauss could identify was the March 1997 notice to all of his vendors directing them henceforth to make commission checks payable to Prime Source Associates, Ltd. When asked what the terms of the "new agreement" with Millenium were, Mr. Chauss answered,

> You know, I don't know, but if there were specific terms that Peter Lin would have wanted in the agreement at that time, if it was important to him, I think that when I notified him in the March letter he would have called me up and offered me a new agreement or told me at some point in time throughout our four or five years after I notified him that he wanted me bound by that original agreement.

(Tr. at 356). Finally, Mr. Chauss was asked, "So there was no agreement. It was on a sale-by-sale basis as far as you're concerned?" He answered, "As far as I'm concerned, yes." (Tr. at 357).

Not surprisingly, the defendants no longer contend that the parties entered into a new contract. Rather, they argue only that

8

Prime Source Accessories, Ltd. cannot be held liable for violation of the Letter Agreement because it was never a party to it.  (Def. Memo. at 16-18).  In fact, Prime Source Accessories, Ltd. is liable under two alternative theories.

First, it is equitably estopped from denying that it assumed the obligations of Chauss Marketing under the Letter Agreement.

> The elements of estoppel are with respect to the party estopped:  (1)  conduct  which  amounts  to  a  false representation  or  concealment  of  material  facts;  (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts.  The party  asserting  estoppel  must  show  with  respect  to himself:  (1)  lack  of  knowledge  of  the  true  facts;  (2) reliance  upon  the  conduct  of  the  party  estopped;  and  (3) a prejudicial change in his position.

Airco Alloys Division, Airco, Inc. v. Niagara Mohawk Power Corp., 76 A.D.2d 68, 81-82, 430 N.Y.S.2d 179, 187 (4th Dep't 1980); see also 57 N.Y. Jur. 2d Estoppel, Ratification and Waiver § 34 (2007).  To be sure, "'[t]he doctrine of equitable estoppel is to be invoked sparingly and only under exceptional circumstances.'" Townley v. Emerson Electric Co., 269 A.D.2d 753, 753-54, 702 N.Y.S.2d 728, 729 (4th Dep't 2000) (quoting Gross v. New York City Health & Hospitals Corp., 122 A.D.2d 793, 794, 505 N.Y.S.2d 678, 679 (2d Dep't 1986)).[5]  This  is  such  a  case.  The "announcement" of the

_____

[5] With respect to common law claims, the parties have relied on New York law, as did Judge Berman in deciding the summary judgment motion.  Thus, New York law governs these claims.  See Motorola Credit Corp. v. Uzan, 388 F.3d 39, 61 (2d Cir. 2004) (implied consent to use of forum law sufficient to establish choice of law).

defendants' change in corporate structure gave no hint that it was anything more than an accounting convenience or that it was intended to abrogate preexisting contracts.  At no time did Chauss Marketing give Millenium ninety days notice that it was terminating the Letter Agreement, as it was required to do by the terms of that contract.  Furthermore, the defendants plainly expected Millenium (and presumably other vendors) to rely on this obfuscation: the defendants continued to use letterhead and business cards identifying Prime Source as a "division" of Chauss Marketing through 2002, and they sought to continue their commercial relationships, at least insofar as those relationships were beneficial to the defendants.  And, of course, the defendants were aware of the true nature and potential legal consequences of their corporate restructuring.  For Millenium's part, it was unaware of the scope of the defendants' reorganization, it relied on the defendants' omissions in continuing to deal with Prime Source, and it was prejudiced because it would otherwise have demanded a non-compete provision as part of any new contract.

Second, even if Prime Source Accessories, Ltd. were not estopped from denying its obligations under the Letter Agreement, it would be liable on the basis of an implied contract.[6]  "A

---

[6] Millenium did not specifically plead a claim of breach of an implied contract in its complaint.  However, Rule 15(b) of the Federal Rules of Civil Procedure permits amendment of pleadings to conform to evidence presented at trial provided that the opposing party is not prejudiced.  See Gussack Realty Co. v. Xerox Corp.,

contract implied in fact 'rests upon the conduct of the parties and not their verbal or written words.'" American Federal Group, Ltd. v. Rothenberg, No. 91 Civ. 7860, 1996 WL 282059, at *13 (S.D.N.Y. May 28, 1996) (quoting Parsa v. State of New York, 64 N.Y.2d 143, 148, 485 N.Y.S.2d 27, 29 (1984)), rev'd on other grounds, 136 F.3d 897 (2d Cir. 1998).

> "As with an express contract, the key element of a contract implied in fact is that there be mutual agreement between the parties." Portugal Trade Corp. v. Spirit Transport, Inc., No. 84 Civ. 7983, 1987 WL 6436, at *7 (S.D.N.Y. Feb. 5, 1987) (citations omitted); accord Watts v. Columbia Artists Management, Inc., 188 A.D.2d 799, 801, 591 N.Y.S.2d 234, 236 (3d Dep't 1992); In re Argersinger, 168 A.D.2d 757, 758, 564 N.Y.S.2d 214, 215 (3d Dep't 1990). Whether certain conduct gives rise to an implied contract is a question of fact, to be determined under the circumstances of the case. See AEB & Associates Design Group, Inc. v. Tonka Corp., 853 F. Supp. 724, 731 (S.D.N.Y. 1994); Radio Today, Inc. v. Westwood One, Inc., 684 F. Supp. 68, 71 (S.D.N.Y. 1988); Watts, 188 A.D.2d at 801, 591 N.Y.S.2d at 236. The relevant inquiry is whether the party to be charged "has conducted himself in such a manner that his assent may fairly be inferred." Miller v. Schloss, 218 N.Y. 400,

---

224 F.3d 85, 94 (2d Cir. 2000). Where, as here, the relevant evidence was presented at trial without objection and the parties addressed the new claim (Def. Memo. at 19 n.7), amendment may be permitted. See Permanent Mission of the Republic of Estonia to the United Nations v. Thompson, __ F. Supp. 2d __, No. 06 Civ. 3144, 2007 WL 707067, at *3 (S.D.N.Y. March 6, 2007); Nicholls v. Tufenkian Import/Export Ventures, Inc., 367 F. Supp. 2d 514, 524 (S.D.N.Y. 2005). Furthermore, a court may deem a pleading amended sua sponte. Aiello v. Town of Brookhaven, 136 F. Supp. 2d 81, 118-19 (E.D.N.Y. 2001) (citing New York State Electric & Gas Corp. v. Secretary of Labor, 88 F.3d 98, 104-05 (2d Cir. 1996)). Because the implied contract claim here is closely related to the plaintiff's claim of breach of the express contract, and because the underlying facts were fully litigated by both parties, I deem the complaint amended to assert a claim of breach of an implied contract.

407, 113 N.E. 337, 337 (1916); accord Tjoa v. Julia
Butterfield Memorial Hospital, 205 A.D.2d 526, 526-27,
612 N.Y.S.2d 676, 677 (2d Dep't 1994).

American Federal, 1996 WL 282059, at *13.

Frequently, a contract is implied where a written agreement
expires but the parties continue to conduct themselves as if the
prior agreement were still in place.  "'[W]hen an agreement expires
by its terms, if, without more, the parties continue to perform as
theretofore, an implication arises that they have mutually assented
to a new contract containing the same provisions as the old.'"
Local Union 813, International Brotherhood of Teamsters v. Waste
Management of New York, LLC, 469 F. Supp. 2d 80, 86 (E.D.N.Y. 2007)
(quoting Martin v. Campanaro, 156 F.2d 127, 129 (2d Cir. 1946)).
Moreover, a continuation of a contract may be implied even where
the parties to the new agreement were not signatories to the old.
This is illustrated by the court's decision in Watts.  There, the
concert pianist André Watts formed a corporation, André Watts
Performances Inc., which contracted with the defendant for the
provision of managerial services.  188 A.D.2d at 799-800, 591
N.Y.S.2d at 236.  "Although the Corporation dissolved in August
1985 and the term of the contract expired September 1, 1986,
defendant continued to provide services to plaintiff [Mr. Watts,
individually,] and plaintiff continued to pay for these services in
the manner provided for in the expired contract between defendant
and the Corporation."  Id. at 800, 591 N.Y.S.2d at 236.  The court

12

concluded that

> the parties' conduct after the expiration of the written
> contract, including defendant's continued rendition of
> services, plaintiff's acceptance of those services and
> plaintiff's payment of commissions in accordance with the
> terms of the written contract, clearly establish a
> contract implied in fact with substantially the same
> terms and conditions as embodied in the expired written
> contract between defendant and the Corporation.

Id. at 801, 591 N.Y.S.2d at 236 (citations omitted).
Significantly, the court determined that "[t]he mere fact that
plaintiff was not a party to the written contract does not preclude
the formation of a new contract, implied in fact, between plaintiff
and defendant, with terms and conditions similar to those contained
in the written contract." Id. at 801, 591 N.Y.S.2d at 237. Of
course, if the circumstances create an inference that the parties
did not intend to continue their relationship on the same terms,
then no new contract will be implied. See Sevel Argentina, S.A. v.
General Motors Corp., 46 F. Supp. 2d 261, 268 (S.D.N.Y. 1999) (no
implied contract where parties' efforts to agree on terms of
continued relationship were unsuccessful).

In this case, Millenium and Prime Source Accessories, Ltd.
maintained for years the same relationship into which Millenium
initially entered with the entity it knew as Prime Source. Mr.
Chauss continued to sell Millenium products to customers and
collect commissions in return. Furthermore, there is no suggestion
that there were any communications at the time the defendants'
corporate structure changed that would have negated an implied

contract containing all of the original terms, including the non-compete clause. Indeed, the defendants' understanding that the non-compete clause remained in force can be inferred from the fact that Mr. Chauss concealed from Millenium the fact that he was selling Prime Source products to the same customers to whom he was marketing Millenium's goods. On one occasion, when forwarding to Millenium an e-mail dealing with modification of some orders from Kohl's Department Stores, Mr. Chauss took the trouble of cutting and pasting the communication to delete all references to Prime Source products. (Tr. at 395-97; Pl. Exh. 46 at 00434-36). Accordingly, Prime Source Accessories, Ltd. remained bound by the obligations created by the Letter Agreement, and it violated those obligations by marketing products that competed with Millenium's.

b. <u>Damages</u>

I. <u>Diverted Sales</u>

> Elementary principles of contract law dictate that damages for a breach of contract should put the non-breaching party in the position it would have occupied but for the breach; the injured party should not recover more from the breach than the party would have gained had the contract been fully performed.

<u>Topps Co. v. Cadbury Stani S.A.I.C.</u>, 380 F. Supp. 2d 250, 269 (S.D.N.Y. 2005); <u>see also</u> <u>Wallace Steel, Inc. v. Ingersoll-Rand Co.</u>, 739 F.2d 112, 115 (2d Cir. 1984) ("In fixing damages for breach of contract, the intent is to put the plaintiff in as good a position as he would have been in had the defendant abided by his

agreement.").

The first element of damages sought by Millenium is the value to it of the sales that the defendants wrongfully made of competing products. In theory, this is an appropriate item for recovery, though Millenium's calculations are flawed and often unsupported by the evidence. For example, it seeks damages for all competing sales made by the defendants through December 2002, even though Millenium terminated the contract in August of that year. (Plaintiff's Post-Trial Brief ("Pl. Memo.") at 15-16). Far more accurate is the defendants' estimate of the losses that Millenium sustained, as set forth in an appendix to the defendants' post-trial brief. Based on invoices from Millenium customers and the testimony of Mr. Lin, it can be determined that Mr. Chauss generated sales of competing products of $423,571.56 up to the date that the contract was terminated. (Pl. Exhs. 45, 46, 47; Tr. at 149-62; Def. Memo. at 27-28). Of course, since this was the gross sales price, Millenium would not have realized anything near that amount in profit. Rather, Mr. Lin acknowledged that his net profit margin was approximately eight percent of gross sales. (Tr. at 250-51). Applying that figure to the sales lost as a result of the defendants' breach ($423,571.56 x .08), Millenium is entitled to damages of $33,885.72, representing the profit it would have made on sales that were diverted by Mr. Chauss.

ii. <u>Lost Profits</u>

Next, Millenium seeks lost profits on the basis that, but for the defendants' breach, Millenium would have continued to realize profits into the future at the same average rate as it had from 1997 to 2002.  (Plaintiff's Post-Trial Responsive Brief at 32-33). This claim fails for at least two reasons.

First, a party seeking lost profits for breach of contract "must prove that lost profit damages were within the contemplation of the parties when the contract was made." <u>Schonfeld v. Hilliard</u>, 218 F.3d 164, 172 (2d Cir. 2000) (citing <u>Ashland Management Inc. v. Janien</u>, 82 N.Y.2d 395, 403, 604 N.Y.S.2d 912, 915 (1993)).  When the contract does not address the issue, "the court must take a 'common sense' approach, and determine what the parties intended by considering 'the nature, purpose and particular circumstances of the contract known by the parties . . . as well as what liability defendant may fairly be supposed to have assumed consciously.'" <u>Id.</u> (quoting <u>Kenford Co. v. County of Erie</u>, 73 N.Y.2d 312, 319, 540 N.Y.S.2d 1, 4 (1989)).  Here, it is evident that the parties did not anticipate lost profits being available for a breach of the Letter Agreement.  Either party was entitled to terminate the contract, indicating that they understood that their relationship was not one of long-term interdependence such that future profits would hinge on adherence to the agreement.

Second, "a plaintiff is entitled to recover lost profits only

16

if he can establish both the existence and amount of such damages with reasonable certainty." Id. (citing Kenford Co. v. County of Erie, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 132 (1986)).  In this case, Millenium has utterly failed to do so.  The only testimony supporting the lost profits claim was that of Mr. Lin; no economist or other expert provided evidence.  Mr. Lin's analysis consisted solely of averaging the sales that Millenium made in the past and projecting them into the future. (Tr. at 164-70). He did not take into account other confounding factors that would explain Millenium's losses, a fatal flaw in light of the fact that the market fluctuated constantly; indeed, Millenium experienced a drop in sales of almost fifty percent between 1999 and 2000 when the contract was being fully performed. (Tr. at 212-13). "Although lost profits need not be proven with 'mathematical precision,' they must be 'capable of measurement based upon known reliable factors without undue speculation.'" Id. (quoting Ashland Management, 82 N.Y.2d at 403, 604 N.Y.S.2d at 915).  Any award of lost profits here would be entirely speculative.

### iii. Liquidation of Inventory

Millenium also seeks damages of some $264,644.71, representing the difference between what it could have realized for the inventory that it had on hand when the contract was terminated and what it actually obtained when it conducted a distress sale. (Pl. Memo. at 15).  However, Millenium never established an adequate

causal relationship between the defendants' breach and these losses.  The fact that Millenium could not move these goods is at least as likely to be attributable to Mr. Lin's decision to terminate the relationship with Mr. Chauss without promptly replacing him as it is to the defendants' breach.

### iv. Warehouse Rental

The same reasoning precludes Millenium's claim for $20,466.00 for the cost of terminating its lease on a warehouse where it stored its products. (Pl. Memo. at 15).  Any relation between that cost and the defendants' breach is attenuated at best; the costs were incurred more directly as a result of the choice to wind down Millenium's business.

### 2. Unjust Enrichment

Under New York law, a claim for unjust enrichment does not lie when there is an enforceable contract. See Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co., 70 N.Y.2d 382, 388-89, 521 N.Y.S.2d 653, 656 (1987).  Moreover, "Clark-Fitzpatrick precludes unjust enrichment claims whenever there is a valid and enforceable contract, whether that contract is written, oral, or implied-in-fact." Beth Israel Medical Center v. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F.3d 573, 587 (2d Cir. 2006). Thus, although Millenium's unjust enrichment claim was properly pled, now that it has been determined that an enforceable contract existed, that claim must be dismissed.

18

3. Misappropriation

Millenium alleges that the defendants misappropriated its trade secrets and proprietary information. "To recover under New York law for the misappropriation of a trade secret, the plaintiff must demonstrate (I) that it possessed a trade secret and (ii) that the defendant used that trade secret in breach of an agreement, a confidential relationship, or duty, or as a result of discovery by improper means." Hudson Hotels Corp. v. Choice Hotels International, 995 F.2d 1173, 1176 (2d Cir. 1993), abrogated on other grounds by Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368 (2d Cir. 2000); see Abernathy-Thomas Engineering Co. v. Pall Corp., 103 F. Supp. 2d 582, 600 (E.D.N.Y. 2000) (applying trade secret standard to misappropriation of proprietary information). Whether information constitutes a trade secret depends upon a variety of factors including:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of the measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Ashland Management, 82 N.Y.2d at 407, 604 N.Y.S.2d at 918 (citation and quotation marks omitted).

In this case, Millenium has failed to identify any information that was both kept confidential and misappropriated by the

defendants.  The defendants did take advantage of their knowledge
of Millenium's customers and pricing to undersell the plaintiffs.
However, Mr. Lin admitted at trial that the identity of Millenium's
customers was no secret, see Leo Silfen, Inc. v. Cream, 29 N.Y.2d
387, 392, 328 N.Y.S.2d 423, 427 (1972) ("Generally, where the
customers are readily ascertainable outside the employer's business
as prospective users or consumers of the employer's services or
products, trade secret protection will not attach[.]"), and he
acknowledged that customers were under no obligation to keep
confidential the prices that Millenium charged.  (Tr. at 203-07).
In fact, not only did Mr. Lin fail to request a non-disclosure
agreement from Prime Source, he never suggested that any of the
information he shared with Mr. Chauss was confidential.  (Tr. at
316).   In addition, Millenium presented no evidence that
information that Mr. Chauss had access to and which might qualify
as trade secret -- such as production techniques and costs -- was
ever misused.  The misappropriation claim therefore fails.

     4. Unfair Competition

By contrast, Millenium has made out a claim of unfair
competition.

> New York's law of unfair competition is a "broad and
> flexible doctrine that depends more upon the facts set
> forth . . . than in most causes of action.  It has been
> broadly described as encompassing any form of commercial
> immorality, or simply as endeavoring to reap where one
> has not sown; it is taking the skill, expenditures and
> labors of a competitor, and misappropriat(ing) for the
> commercial advantage of one person . . . a benefit or

property right belonging to another."
Telecom International America, Ltd. v. AT & T Corp., 280 F.3d 175, 197-98 (2d Cir. 2001) (quoting Roy Export Co. Establishment v. CBS, Inc., 672 F.2d 1095, 1105 (2d Cir. 1982)).  As discussed above, Millenium has failed to establish that the defendants misappropriated any proprietary information, a common predicate for an unfair competition claim.  See, e.g., Eagle Comtronics, Inc. v. Pico Products, Inc., 256 A.D.2d 1202, 1203, 682 N.Y.S.2d 505, 506 (4th Dep't 1998) (gravamen of unfair competition claim is "exploitation of proprietary information or trade secrets").  However, it has demonstrated that the defendants acted wrongfully by soliciting sales in violation of the non-compete provision.  See Leo Silfen, 29 N.Y.2d at 392, 328 N.Y.S.2d at 427 (allegations of "wrongful" tactics in solicitation of customers would state claim for unfair competition).  Thus, Millenium has made out its claim for unfair competition, though under the circumstances of this case, its recovery on this cause of action mirrors its damages for breach of contract.

    5. Accounting

    Next, Millenium demands an accounting of the profits obtained by the defendants.  "In order to establish a right to an accounting, which is an action in equity, plaintiff must demonstrate the existence of a fiduciary relationship between himself and defendant, or the existence of a joint venture or other

21

special circumstances warranting equitable relief." <u>Rodgers v.</u>
<u>Roulette Records, Inc.</u>, 677 F. Supp. 731, 738 (S.D.N.Y. 1988).

> Broadly stated, a fiduciary relationship is one founded
> upon trust or confidence reposed by one person in the
> integrity and fidelity of another.  It is said that the
> relationship exists in all cases in which influence has
> been acquired and abused, in which confidence has been
> reposed and betrayed.  The rule embraces both technical
> fiduciary relations and those informal relations which
> exist whenever one man trusts in, and relies upon,
> another.

<u>Penato v. George</u>, 52 A.D.2d 939, 942, 383 N.Y.S.2d 900, 904-05 (2d
Dep't 1976) (internal citation omitted).  However, "an arm[']s-
length business relationship does not give rise to a fiduciary
obligation." <u>WIT Holding Corp. v. Klein</u>, 282 A.D.2d 527, 529, 724
N.Y.S.2d 66, 68 (2d Dep't 2001) (citation omitted).  Generally, the
relationship between an exclusive sales representative and a
distributor, without more, is not a fiduciary relationship.  <u>See</u>
<u>Kidz Cloz, Inc. v. Officially for Kids, Inc.</u>, 320 F. Supp. 2d 164,
176 (S.D.N.Y. 2004) (absent proof of joint venture or partnership,
manufacturer did not owe fiduciary obligations to sales agent);
<u>Brasport, S.A. v. Hoechst Celanese Corp.</u>, 747 F. Supp. 199, 202
(S.D.N.Y. 1990) (same).

     Here, as in <u>Brasport</u>, Millenium and the defendants "had a
commercial relationship, plain and simple. . . .  There was no
'intimate relationship' between [the parties] to warrant
application of more rigorous obligations[.]" 747 F. Supp. at 202
(citation omitted).  As discussed above, even if Millenium shared

confidential information with the defendants, there is no evidence that the defendants betrayed that trust by misusing the information.  The defendants' liability is for breach of contract, not for breach of any fiduciary duty, and a claim for accounting therefore does not lie.

### 6. Conversion

#### a. Liability

Finally, Millenium seeks to recover the value of samples that it provided to the defendants but which were not returned when the relationship was terminated.

> A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession.  Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights.

Colavito v. New York Organ Donor Network, Inc., 8 N.Y.3d 43, 49-50, 827 N.Y.S.2d 96, 100 (2006) (internal citations omitted).  At trial, the plaintiff established that of numerous samples it had lent to the defendants for display in their showroom, 39 had not been returned.  (Tr. at 140-41).  There is no dispute that ownership had remained with Millenium, that it had demanded the return of the samples, and that the defendants had failed to fully comply with the request.  The defendants argue that it was commonplace for sales agents to give samples to customers.  However, there is no proof that the specific samples here were

provided to prospective buyers or that Millenium explicitly or implicitly approved the practice.   The defendants are therefore liable for conversion of the missing samples.

### b. Damages

Initially, Millenium sought recovery of the entire cost of producing the samples, including the expense of the molds from which the samples were cast.   At trial, however, the plaintiff agreed to withdraw the claim for mold charges.   (Tr. at 176). Millenium contends that the parties thereby "stipulated" that it is entitled to damages of $2,470.00 on the conversion claim.   (Pl. Memo. at 14 n.7).   That is incorrect.   They merely stipulated that the damages, if any, would equal the value of the samples and would not include associated production costs.   While Millenium did not present evidence of the value of any specific sample, perusal of the invoices submitted at trial reveals that the unit cost of the plaintiff's product line ranged from less than fifty cents to $5.00, with the average being about $2.00.   (Pl. Exh. 47).   An appropriate award is therefore $2.00 for each of the 39 samples, or $78.00.

### B. Prime Source's Claims

#### 1. Failure to Pay Commissions

##### a. Liability

Prime Source's counterclaims are governed by Minnesota law, since its primary place of business is in that state.   See Minn.

Stat. § 325E.37(6)(a) (Minnesota Sales Representative Act applies to any sales agent maintaining a residence or principal place of business in that state). Under Minnesota statutory law, a business that terminates its relationship with an independent sales representative is obligated to make prompt payment of outstanding commissions. Minn. Stat. § 181.145(2). A commission is deemed "earned through the last day of employment" if it relates to goods booked and shipped by the sales representative's last day of work. Minn. Stat. § 181.145(1). An employer who terminates a sales agent has a grace period of three days within which to pay commissions earned through the last day of employment. Minn. Stat. § 181.145(2)(b). At the end of the grace period, a penalty period begins during which the employer must pay a penalty of 1/15 of the commissions earned through the last day of employment for each additional day that payment is delayed. Minn. Stat. § 181.145(3). Thus, if fifteen days elapse without payment being made after the grace period ends, the employer is liable for a penalty equal to the full amount of the commissions earned through the last day of employment. Finally, a sales representative remains entitled to payment of commissions on sales made before termination even if the goods were not shipped until after termination, but no penalty applies to the failure to make prompt payment of such commissions. Minn. Stat. § 181.145(5).

Mr. Lin acknowledges that Millenium failed to pay commissions

due to Prime Source at the end of the relationship.  (Tr. at 241-44).  Millenium's only defense is that its obligation did not run to Prime Source Accessories, Ltd., the only counterclaim plaintiff, because that entity was never a signatory to the Letter Agreement.  However, as discussed above, a contract implied-in-fact was established between Millenium and Prime Source Accessories, Ltd.  Accordingly, Millenium is liable for violation of Minnesota law as well as for breach of contract.

b. <u>Damages</u>

Prime Source established at trial that it was entitled to $65,997.68 in commissions for goods booked and shipped prior to August 9, 2002 when Millenium terminated the relationship.  (Tr. at 333-36; Def. Exhs. 11, 12, 13).  It also seeks $95,956.23 for goods that were to be shipped after August 9.  (Tr. at 335; Def. Exh. 13).  However, of that amount, $60,400.00 consists of "estimated" holiday orders that Mr. Chauss expected to obtain from the Kohl's and Target chain stores.  Whatever his expectations, these commissions had not been booked at the time of termination, and any award would be entirely speculative.  In total, then, Prime Source will be awarded $101,553.91 in commissions due.

In the normal course, Prime Source would also be entitled to a penalty equal to the commissions for goods booked and shipped, that is, an additional $65,997.68, together with an award of attorneys' fees and costs.   Minn. Stat. § 181.145(4)(b); <u>see</u>

26

<u>Dougan v. Niedermeier, Inc.</u>, 419 N.W.2d 112, 114 (Minn. Ct. App. 1988) (sales agent awarded penalty under Minn. Stat. § 181.145 also entitled to attorneys' fees).  However, notwithstanding the fact that the statute states that a penalty "shall" be awarded, Minnesota courts have found that such an award is discretionary. See <u>Stuart v. Midwest/Northern, Inc.</u>, No. C6-01-714, 2001 WL 1608832, at *3 (Minn. Ct. App. Dec. 18, 2001).[7]  In this case I will exercise that discretion and deny any penalty.  As noted above, Mr. Chauss submitted a false affidavit in connection with the defendants' motion for summary judgment.  "The principle that a perjurer should not be rewarded with a judgment -- even a judgment otherwise deserved -- where there is discretion to deny it, has a long and sensible tradition in the common law."  <u>ABF Freight System, Inc. v. N.L.R.B.</u>, 510 U.S. 317, 329 (1994) (Scalia, J., concurring).  Under the extraordinary circumstances here, it would be unjust to grant an award that would do more than make Prime Source whole.

     2. <u>Wrongful Termination</u>

Minnesota law also restricts the circumstances under which a sales representative may be terminated.  Minn. Stat. § 325E.37.

---

    [7] The <u>Stuart</u> decision was unpublished and therefore not precedential. <u>See</u> Minn. Stat. 480A.08(3).  However, its reasoning is persuasive, and it has been referenced (and distinguished) by the United States District Court for the District of Minnesota. <u>See</u> <u>P.I.M.L., Inc. v. Chain Link Graphix, LLC</u>, No. 04 CV 3041, 2006 WL 3518394, at *6 (D. Minn. Dec. 6, 2006).

The employer may not terminate the representative without good cause and generally must provide ninety-days notice and a sixty-day period within which the representative may seek to cure the situation that serves as the basis for termination. Minn. Stat. § 325E.37(2). Good cause is defined as:

> a material breach of one or more provisions of a written sales representative agreement governing the relationship with the manufacturer, wholesaler, assembler, or importer, or in the absence of a written agreement, failure by the sales representative to substantially comply with the material and reasonable requirements imposed by the manufacturer, wholesaler, assembler, or importer.

Minn. Stat. § 325E.37(1)(b). However, the notice and cure requirements do not apply in certain enumerated circumstances, such as where the sales representative is convicted of violating a law relating to his employment or where he voluntarily abandons his business. Minn. Stat. § 325E.37(1)(b). When a sales representative proves that he has been terminated in violation of § 325.37, he "is entitled to be paid for all sales as to which the representative would have been entitled to commissions pursuant to the provisions of the sales representative agreement, made prior to . . . the end of the notification period . . . regardless of whether the goods have actually been shipped." Minn. Stat. § 325E.37(4). Thus, the representative can, in effect, receive lost profits for a wrongful termination. See Wingert & Associates, Inc. v. Paramount Apparel International, Inc., 458 F.3d 740, 744 (8th Cir. 2006).

Here, Millenium had good cause to terminate Prime Source based on Prime Source's breach of the contract. However, that breach does not fall into any of the categories that allow for immediate termination under Minnesota law. Consequently, Millenium violated § 325E.37 by failing to provide the statutorily-required notice and an opportunity to cure.

Relying on Hagstrom v. American Circuit Breaker Corp., 518 N.W.2d 46 (Minn. Ct. App. 1994), Millenium argues that it was entitled to terminate Prime Source for good cause at any time under the Letter Agreement and therefore was not obligated to provide the statutory notice. (Plaintiff's Post-Trial Responsive Brief at 15-16). This is a serious misreading both of the Letter Agreement and of Hagstrom. The Letter Agreement permitted termination of Prime Source only on grounds of good cause, but it required ninety days notice for any termination. (Pl. Exh. 2, ¶ 7). In Hagstrom the court relieved the employer of the statutory notice provision because it did not apply: the agreement between the parties contained a choice of law clause providing that the law of a state other than Minnesota governed the relationship. Id. at 48-49. Here, the Letter Agreement, and the implied contract that succeeded it, contained no such provision.[8]

_____

[8] Millenium also acted in contravention of the provision of the Letter Agreement requiring ninety days notice of termination. (Pl. Exh. 2, ¶ 7). However, in contrast to Minnesota statutory law which requires prior notice even in the case of termination for good cause (except in enumerated circumstances), the common law

Prime Source, however, has failed to prove damages.  Just as Millenium's claim for lost profits was speculative, so too is Prime Source's.  Prime Source provided no expert economic analysis.  It offered no specific calculation based on sales actually made by Millenium.  Instead, Mr. Chauss merely extrapolated from the commissions he had received over the two years prior to the termination in order to estimate what he might have made over the six months after.  (Tr. at 336-38; Def. Exh. 11).  Indeed, he failed to demonstrate that Prime Source suffered any losses at all, since he neglected to compare what the company actually made during that six-month period compared to what it might have made had it continued as Millenium's representative.  Therefore, Prime Source is entitled to no damages on this claim.

Conclusion

For the reasons set forth above, Millenium is entitled to judgment against Prime Source Accessories, Ltd. and damages of $33,885.72 on its claims for breach of contract and unfair competition and $78.00 on its claim for conversion, for a total of $33,963.72, together with prejudgment interest.  Millenium's claims

---

relieves a party of all its obligations under a contract when the other party has committed a material breach.  See National Westminster Bank PLC v. Grant Prideco, Inc., 261 F. Supp. 2d 265, 270 n.28 (S.D.N.Y. 2003); Alesayi Beverage Corp. v. Canada Dry Corp., 947 F. Supp. 658, 667 (S.D.N.Y. 1996).  Thus, once Prime Source had breached by selling competing products, Millenium was relieved of its contractual obligation to provide notice prior to termination.

of misappropriation of trade secrets, misappropriation of proprietary information, unjust enrichment, and an accounting of profits are dismissed.   Prime Source is entitled to judgment against Millenium and damages of $101,553.91, together with prejudgment interest, on its counterclaims for failure to pay commissions and for termination of the sales representative agreement without proper notice.   Within ten days of the date of this decision, counsel shall each submit a proposed judgment on notice.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       March 30, 2007

Copies mailed this date:

Sidney A. Weisberg, Esq.
Weisberg & Weisberg
98 Cutter Mill Road
Great Neck, New York   11021

D. Clay Taylor, Esq.
D. Clay Taylor, PA
1300 Nicollet Mall, Ste. 5002
Minneapolis, MN   55403

Laurent S. Drogin, Esq.
Tarter Krinsky & Drogin LLP
470 Park Avenue South, 14th Floor
New York, NY 10016